Beatrice JONES, Appellant,

v.

Lonnie JONES, Sr., Respondent.

No. 46340.

Missouri Court of Appeals,
Eastern District,
Division Five.

Aug. 2, 1983.

Motion for Rehearing/Transfer to
Supreme Court Denied Sept. 15, 1983.

Donald C. Anton, St. Louis, for appellant.

Alan Agathen, Clayton, for respondent.

NORWIN D. HOUSER, Senior Judge, Special Judge.

Upon a finding that the marriage between Beatrice and Lonnie Jones was irretrievably broken the circuit judge dissolved the marriage, divided the marital property and awarded Beatrice $175.00 a month maintenance. Beatrice has appealed, challenging the division and contending that the maintenance award is inadequate; that both are against the weight of the evidence and that the awards ignore Lonnie's marital misconduct. She also asserts error in excluding pertinent evidence, and that she received ineffective assistance of counsel at the trial.

Married in 1930, the couple had four children, all of whom are now emancipated and live outside the home. The parties purchased a house in 1955, at a cost of $10,500. The husband worked for a packing house until his retirement in 1968. The wife remained in the home, raising the children and performing household duties. The house is free of mortgage debt and is now worth about $30,000. Both parties live in the house, in separate bedrooms. The upstairs is rented for $84.00 a month, and a garage is rented for $9.00 a month. Lonnie, aged 77 years, receives Social Security of $488.00 a month, a monthly pension of $117.00, and half the rent ($46.50) each month. In retirement he has worked as a guard at a school crossing, for $13.00 a day when he works. There is no evidence of the number of school days he worked during any year. He was not working at time of trial in August 1982 and did not know whether he would be going back in September. Beatrice, who has never worked outside the home and is unable to take outside employment because of high blood pressure and heart trouble, receives $209.00 a month Social Security and $46.50 a month rent. She has a $4,000 savings account which she saved from Social Security and rent money. There is a bank account in the name of Lonnie Jones, Trustee for Beatrice Jones, in the sum of $3,910.86, the source of which

was not shown. Lonnie has a 1977 Oldsmobile, clear of debt, the value of which was not established.

There is no evidence of the necessary living expenses of either party for food, clothing, medical costs and incidentals, and no evidence of the amount of taxes on the property, or the cost of insurance, repairs and maintenance, or the cost of water, light and heat.

The dissolution decree orders respondent to pay appellant $175.00 per month as maintenance beginning September 1, 1982, and orders each party to pay his or her attorney's fee. The court awarded each party his or her separate clothing and jewelry, and an undivided one-half interest in the house. The $4,000 bank account was awarded to appellant, the $3,910.86 bank account to respondent. Appellant was awarded the furniture in her bedroom, the living room and the kitchen. Respondent was awarded his bedroom furniture and all other furniture and furnishings in the residence not specifically distributed to appellant. Respondent received the Oldsmobile.

■ We review this court-tried case under Rule 73.01, and are obliged to sustain the decree unless there is no substantial evidence to support the decree, unless the decree is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.Banc 1976). Due regard must be given to the trial court's ability to judge the credibility of the witnesses.

Although there is no evidence as to respondent's monthly or annual earnings as school crossing guard, appellant's counsel argues that respondent's income from the job would be $1,872 per year or $156.00 per month, based upon an assumption that he would work on 144 days of a 180-day school year. On this assumption the monthly income of the parties would be as follows:

| Respondent | | Appellant | |
|---|---|---|---|
| $ 488.00 | (Social Security) | $ 209.00 | (Social Security) |
| 117.00 | (Pension) | 46.50 | (Rental Income) |
| 46.50 | (Rental Income) | | |
| 156.00 | (Job) | | |
| $ 807.50 | | $ 255.50 | |
| −175.00 | (Maintenance Award) | +175.00 | (Maintenance Award) |
| $ 632.50 | | $ 430.50 | |

■ Without the job income (and there is no assurance that this 77 year-old man can or will continue to receive remuneration from this source) respondent's monthly income would be $476.50, compared to appellant's $430.50 income. Accepting counsel's assumption and computation of à $202.00 differential between the incomes of the parties, we find no manifest abuse of discretion in the amount of the award for maintenance. On the issue of respondent's alleged misconduct during the marriage, the testimony of appellant, contradicted by respondent in every significant particular, fails to establish marital misconduct justifying appellate intervention.

Appellant charged improper association with other women, beginning about the time respondent retired. In 1964 the Jones rented upstairs rooms to a young single woman and her mother. The renters changed the locks on the upstairs door. Appellant insisted that the renters provide appellant with a key to the door, and when they delayed appellant told respondents the tenants would have to move if the key was not supplied. Respondent did not think a key should be required and the parties had a disagreement on the subject. Appellant suspected that her husband had or was having an affair with either the tenant or the mother, but there is no record evidence to support her suspicion. Appellant was incensed when one day she came back from shopping to find that in her absence her husband had permitted a neighbor lady to

store a quantity of meat in the Jones freezer chest, without appellant's knowledge or consent. In 1967 the Jones took a trip to Los Angeles to visit respondent's relatives. Appellant's enjoyment of the trip was limited because she was required to do the cooking at the home they were visiting and was not taken out to see the sights. Appellant testified that every year since 1967 respondent has made a trip to Los Angeles, without asking appellant to accompany him. He also makes two or three trips annually to Chicago and to Tennessee, but does not take appellant with him. Appellant testified that in 1975 a package containing a thermal suit was received at the Jones home, addressed to respondent, from one Marie Walker in Los Angeles, in her handwriting. A card from one "Marie", in the same handwriting, was discovered by appellant while she was in respondent's room, going through his checks, "papers and things in the headboard of his bed." There she also found a letter from Marie Walker suggesting various places to go and see in Hawaii, where respondent was planning to go on a visit; a photograph of a young lady in Hawaii, placing a lei around respondent's neck; a check for $218.00 payable to Mrs. Marie Grammer; a photograph of respondent with a lady coordinator of Ebony Fashion Show; a note reading "Please accept my sincere thanks for the money. Mrs. Ernie Harris"; a thank-you note from Mrs. Constance Ross; a picture of a young lady, with the following notation on the back: "To Mr. Jones, a nice man. I will always remember the nice things you have done. I will keep you in my heart forever. Always, Wanda Childress." Appellant testified that although she was willing, the parties had not had sexual relations since 1967—that respondent had not "approached" her since 1967; that two years ago he stopped sleeping in the same bed with her and started sleeping in another bedroom. She claimed he shows no affection for her and does not talk to her. She is unwilling to go to marriage counselling. Appellant stopped cooking for respondent three or four years ago, when he stopped giving her money for groceries. She does

not do his laundry or clean his room. Appellant conceded that respondent drives her to church every sunday morning, where he ushers and she sings in the choir; that he drives her to choir rehearsal once a week and to the grocery store weekly, but she said he never takes her out socially, or to the movies or restaurants.

In response to this testimony respondent denied improper association with other women. Respondent specifically denied ever associating with the young woman tenant. In support of his attitude about the key to the upstairs rooms respondent said " * * * a lot of people don't want you to have no key to their apartment * * *." Appellant has nagged or talked about the key incident and the freezer problem ever since the sixties. Respondent testified that in the sixties he asked appellant about having sex and she refused, wanting him to "use protection," which he would not use. (She denied refusing sex without protection). They have had no sex since 1967 or 1968, according to respondent, who last asked her for sex four or five years ago. Respondent testified he has made six or seven trips to Los Angeles to visit his nieces and nephews. (He mentioned a niece named Octavia, but could not remember her married name). He stays with the relatives, not in a hotel, when in Los Angeles. After the first trip to Los Angeles appellant would not go any more, although respondent says he offered to take her each time.

Respondent testified that he did not know who Marie was; that he knew nothing about the card signed "Marie"; knew nothing about the letter listing places to go in Hawaii, and did not remember seeing it before the day of the trial. He denied ever having seen the letter signed by Marie, said he knew nothing about that. He could not place the thank-you notes from Mrs. Harris and Mrs. Ross. He speculated that those letters referred to donations, although he could not recall giving money to them. He said, "I always donate to somebody—I always like to give to charity." He explained that Marie Grammer is a travel agent—his nephew's girlfriend—and that the $218.00

check was for an airline ticket to Los Angeles. It was so marked on the check. Respondent acknowledged he knew Wanda Childress and explained that she is a 13-year-old schoolgirl; that school children "have a lot of pictures made"; that as a crossing guard respondent used to help Wanda across the street, and that all the children liked him "cause I was so nice to them." The picture of the young lady placing a lei around his neck in Hawaii was taken as he got off the plane. The photograph of respondent with the fashion show lady was taken at the request of respondent's nephew. The fashion show commentator was the nephew's girlfriend.

Respondent felt that the marriage could be saved and said he was willing to do his share to save it. He does not want a divorce and dissolution; he would rather "we both stay in the house and live happy because I worked hard for that home." He testified he takes appellant places when she wants to go; that he drives her to church each Sunday; to choir rehearsal and to the grocery store once a week. He stated he has told appellant he would take her to restaurants and movies, and even to a ballgame, "but she shoo me off"; that there was a neighborhood party attended by everyone in the block except appellant, who "just don't want to go out with me any more."

The question of marital misconduct resolves itself into a choice between two conflicting versions of the facts, and depends upon the credibility of the contending adverse parties. Whether respondent has been guilty of marital misconduct as charged is a determination within the peculiar province of the trial judge, with his superior opportunity to observe and evaluate the appellant and respondent and to assess the weight and value to be given their testimony. On the issue of marital conduct the trial judge obviously found the issue in favor of respondent, and we defer to his determination in this regard.

■ On this record there is substantial evidence to support the conclusion that there is a reasonable explanation for many of the circumstances which created a suspicion of infidelity in the mind of appellant; that respondent is innocent of the grievous marital misconduct charged; that neither the award of an undivided one-half interest in the real property nor the $175.00 maintenance award is against the weight of the evidence; that the fairly even division of the marital property should be sustained, and that the maintenance award balances appellant's needs against respondent's ability to pay. There is no basis on the ground of marital misconduct for augmenting the maintenance award or of vesting the whole title to the house in appellant.

In Point III appellant complains about the action of the court in excluding certain bits of evidence.

■ On direct examination of appellant an objection was sustained to the letter from Marie listing various places in Hawaii to go and see, and the letter was stricken. On cross-examination, however, counsel for respondent read into the record the contents of the letter verbatim, and therefore appellant was not prejudiced by the court's ruling.

■ The court sustained an objection to the question, "Did your husband neglect his marital duties toward you?" on the ground that the question was obscure and ambiguous. The objection more properly would have been sustained on the ground that it called for a conclusion of the witness, but the court reached the correct result and there was no prejudice to appellant.

■ Asked if she had any evidence that her husband was having an affair with the young woman tenant appellant testified she told respondent that if the tenant did not give her a key the tenant would have to move to another place, to which respondent answered that he would get a room somewhere else. The court erroneously struck the answer on the ground that it was "conclusionary", but the error was harmless.

Finally, in Point IV appellant contends that she received ineffective assistance of counsel during the trial in that counsel

failed to develop a number of points and introduce certain specified evidence bearing on respondent's misconduct, all of which had been brought to counsel's attention by appellant.

This point was not raised or presented in the trial court in a motion for new trial filed within 15 days after the decree was entered on August 5, 1982, or by way of a motion to reopen the case to consider additional evidence filed within the 30 days after entry of judgment in which the trial court retained control over its judgment, Rule 75.01.

A point not raised or presented in circuit court and raised in the appellate court for the first time is not preserved for review. *In re Marriage of Hanners*, 549 S.W.2d 941[3] (Mo.App.1977); 2A Mo.Dig. Appeal & Error Key No. 169.

The decree does not define and spell out the rights of the parties with reference to possession and occupancy of the home. It is apparent, however, that neither party is willing to leave and quit the premises, and that an accommodation has been reached whereby each occupies the separate rooms containing the furniture assigned by the decree to the respective parties. The decree should make provision for this type of possession and occupancy, thereby enabling each party to enjoy the use of a one-half interest in the premises. Although there is no evidence as to the amount of taxes, insurance, repairs and maintenance and cost of utilities, we are of the opinion that, consistent with the equal treatment accorded the parties in other respects, these items of cost and expense should be shared equally between the parties.

Accordingly, the decree is affirmed in all particulars except as to rights of possession and occupancy, taxes, insurance, repairs, maintenance and utilities, and the cause is remanded for entry of a modified decree consistent with the views expressed in this opinion. *Colabianchi v. Colabianchi*, 646 S.W.2d 61 (Mo.banc 1983).

KAROHL, P.J., and ARTHUR LITZ, Special Judge, concur.